UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

ROBERT MUHLENKAMP,

               Petitioner,

      v.

ALLISON BLIZZARD,

               Respondent.

NO. CV-07-0231-EFS

**ORDER DENYING PETITIONER'S REQUEST FOR RELIEF UNDER THE HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION**

On September 12, 2007, the Court held a hearing in the above-captioned matter. Petitioner Robert Muhlenkamp appeared, represented by David B. Starks. Respondent Allison Blizzard appeared, represented by J. Michael Keyes. Before the Court was Petitioner's request for relief under the Hague Convention on the Civil Aspects of International Child Abduction. After reviewing the submitted materials and applicable authority and hearing from counsel, the Court was fully informed.

### I.  Procedural History

On October 18, 2006, Mr. Muhlenkamp filed a "Request for Return" of E.M. with the German Central Authority, the appropriate German agency under the Hague Convention. Circa November 2, 2006, the request was sent to the U.S. Department of State and the National Center for Missing and Exploited Children (NCMEP), the appropriate U.S. "Central Agency" under

ORDER ~ 1

the Hague Convention.  NCMEP located E.M. on March 12, 2007, in Spokane. On April 10, 2007, NCMEP requested Ms. Blizzard to voluntarily return with E.M. to Germany to resolve custody pursuant to German law. Ms. Blizzard notified NCMEP on April 13, 2007, that she would not voluntarily return E.M. to Germany.

On July 17, 2007, Mr. Muhlenkamp filed his petition with this Court to determine whether E.M. was "wrongfully removed or retained" from Germany and should be returned to Germany pursuant to the Hague Convention.   This Court has already dispensed with several of Mr. Muhlenkamp's requests for relief.   Remaining requests for this Court's decision are: (1) "an Order directing the prompt return of [E.M.] to her habitual residence of Germany"; (2) "an Order directing Ms. Blizzard to pay Mr. Muhlenkamp's legal costs and fees"; and (3) "any such further relief as justice and its cause may require."

Also in the spring of 2007, Mr. Muhlenkamp began legal proceedings in Germany to regain custody of E.M.  Apparently, without any notice to Ms. Blizzard or opportunity to defend herself, the Bayreuth Local Court entered a judgment finding Ms. Blizzard "wrongfully removed" E.M. from Germany to the United States based on a "plausible" showing of facts by Mr. Muhlenkamp.

## II.  Findings of Fact

The Court makes the following findings of fact:

E.M. was born to Mr. Muhlenkamp and Ms. Blizzard on April 29, 2004, in Duisburg, Germany.  Shortly thereafter, the parties obtained a U.S. birth certificate, a U.S. passport, and a U.S. social security number, all for E.M.  The parties repeatedly discussed an eventual relocation to

the United States.  Mr. Muhlenkamp and Ms. Blizzard married on June 8, 2005, in Duisburg.  Mr. Muhlenkamp is a musician and a citizen of Germany.  Ms. Blizzard is an academic professor, a born citizen of the United States, and later became a resident of Germany, where she was a resident until June 2006.  Mr. Muhlenkamp, Ms. Blizzard, and E.M. moved to Bayreuth, Germany, in August or September of 2005.

Prior to 2006, Ms. Blizzard's mother lived in Germany.  At some point Ms. Blizzard's mother became ill with a physically degenerative disease.  In order to receive care, Ms. Blizzard's mother moved from Germany to Mesa, Arizona, in January 2006.  The disease was of such a character that at certain onsets Ms. Blizzard's mother would irreparably lose control of certain extremities.  On February 22, 2006, Ms. Blizzard drafted a permission letter allowing her to travel with E.M. to Mesa, Arizona, from February 25, 2006, to March 20, 2006, which Mr. Muhlenkamp signed and was notarized.  During this period, Ms. Blizzard and E.M. visited Ms. Blizzard's mother, who was in declining health, in Arizona at the address contained in the consent letter.

In the spring of 2006, in addition to her sick mother, Ms. Blizzard was also focused on finding a career position outside of Germany.  Her two-year term as a professor at a university in Bayreuth was to expire soon and, under local German law, Ms. Blizzard could not continue employment in the Bayreuth area.  Ms. Blizzard explored new positions in a number of countries, including the United States.  Mr. Muhlenkamp and Ms. Blizzard discussed her prospects, recognizing Ms. Blizzard would likely take an employment position outside of Germany. They also recognized that E.M. would be best provided for by Ms. Blizzard as she

ORDER ~ 3

would have more income.   In late April and early May of 2006, Ms. Blizzard went alone to Spokane, Washington, for a job interview at Spokane Falls Community College.  Ms. Blizzard had received her Associate of Arts Degree from Spokane Falls many years before.  Ms. Blizzard was interviewing for a position held by her former professor for the prior twenty years.   Upon arriving at the train station in Frankfurt, Germany, on May 1, 2006, for her final train leg to Beyreuth, Ms. Blizzard called Mr. Muhlenkamp to inform him she had arrived a day early.   During this phone call, Mr. Muhlenkamp told Ms. Blizzard that he wished to separate from her.

The testimony and record indicates, prior to April 2006, Mr. Muhlenkamp was a loving father who watched over his child E.M. daily. For the first few months after E.M. was born, Ms. Blizzard suffered an illness which made simple tasks difficult; therefore, Mr. Muhlenkamp became the primary care giver.  When Ms. Blizzard regained her health and returned to steady employment as a professor at a university in Bayreuth, Ms. Blizzard took over many of the parenting responsibilities. Ms. Blizzard soon assumed most of the parenting responsibilities as Mr. Muhlenkamp suffered from sleep apnea, depriving Mr. Muhlenkamp of rest and resulting in sloggish mornings.

Leading up to April 2006, Mr. Muhlenkamp slowly adjusted E.M. to a daycare facility by initially staying with E.M. for a few minutes, then an hour, and finally not staying at all.   In April 2006, E.M. began attending daycare full time and continued through June 2006.  With E.M. in daycare, Mr. Muhlenkamp had more time to search for employment and to practice with a rock band he recently joined.

When Ms. Blizzard returned from the Spokane Falls interview, Mr. Muhlenkamp moved out of their shared apartment into his own apartment. He expressed no desire to visit Ms. Blizzard or to provide care for E.M. between May 1 and June 12, 2006. E.M. remained in the care of Ms. Blizzard and continued full-time daycare until June 12, 2006. On or about May 23, 2006, Ms. Blizzard informed Mr. Muhlenkamp that Spokane Falls Community College had offered her a job which he understood she would accept. Mr. Muhlenkamp then signed a letter terminating the lease on the marital apartment.

On May 5, 2006, Ms. Blizzard drafted a permission letter to allow her "to travel internationally and remain abroad indefinitely with [E.M.]," which Mr. Muhlenkamp signed and was notarized. On June 7, 2006, at Mr. Muhlenkamp's request, Mr. Muhlenkamp and Ms. Blizzard met with Hubert Wattenbach, a social worker employed by the city of Bayreuth. Mr. Wattenbach testified that Mr. Muhlenkamp was concerned whether E.M. would be returned to him if Ms. Blizzard died while living with E.M. in the United States. Therefore, as of June 7, 2006, Mr. Muhlenkamp understood E.M. was to relocate to the United States because her mother, Ms. Blizzard, had employment in the United States.

On June 12, 2006, Ms. Blizzard left with E.M. for the United States without any prior notice to Mr. Muhlenkamp. On the train to the airport in Frankfurt, Germany, Ms. Blizzard and E.M. encountered Ralph Puffer, a family acquaintance who knew E.M. Because he was merely an acquaintance, Ms. Blizzard did not disclose they were going to Arizona and told him they were visiting a friend in Frankfurt. After arriving in the United States, Ms. Blizzard had her belongings shipped to her.

ORDER ~ 5

When Ms. Blizzard and E.M. arrived in Phoenix, Arizona, Ms. Blizzard attempted to call Mr. Muhlenkamp several times in order to tell him their whereabouts, finally connecting with him on June 14, 2006, after 25 phone calls. During the phone call, Ms. Blizzard impressed upon Mr. Muhlenkamp that she would return to Germany within two weeks. In an email sent to Ms. Blizzard on June 16, 2006, Mr. Muhlenkamp expressed displeasure that Ms. Blizzard had taken E.M. to the United States without his knowledge. Mr. Muhlenkamp felt he had lost two weeks of time with E.M. prior to her final departure for the United States with Ms. Blizzard and pleaded with Ms. Blizzard, "please promise me that you will not just leave [E.M.] in America." On June 22, 2006, Mr. Muhlenkamp sent another email to Ms. Blizzard, demanding Ms. Blizzard inform him of when she would be returning with E.M. so that he may "make use of the time I have left with [E.M.] in Germany." In this email, Mr. Muhlenkamp expressed his belief that a continued stay beyond two weeks was "not legal."

On June 26 and 27, 2006, Mr. Muhlenkamp sent third and fourth emails, warning Ms. Blizzard that he was considering filing an action against her in Germany with the Youth Services Office. On July 3, 2007, Mr. Muhlenkamp sent another email stating, "When you are back here, we can calmly settle everything that needs to be addressed." Based on the clear and unambiguous understanding by Mr. Muhlenkamp that Ms. Blizzard would be returning with E.M. to Germany to finalize agreement on future visitation with E.M. and on other parental rights and responsibilities, the Court finds Mr. Muhlenkamp intended, and never waived the right, to determine such custody rights of E.M. in Germany under German law.

In reaction to the July 3 email, Ms. Blizzard decided to not talk by phone to Mr. Muhlenkamp, although she did allow Mr. Muhlenkamp to talk to E.M., who was two years old at the time.   On August 14, 2006, Mr. Muhlenkamp revoked his previous permission letter.   This revocation letter was sent to Ms. Blizzard's sister Billie Zundel in Mesa, Arizona. At some point in August or September of 2006, Ms. Blizzard moved to Spokane, Washington, with E.M., where they have resided since.   On August 23 and 28, 2006, Mr. Muhlenkamp emailed Ms. Blizzard requesting she provide information regarding expected departure for Spokane and information about the daycare that E.M. would be enrolled. Mr. Muhlenkamp infrequently called E.M. to talk with her, partly due to his employment hours, necessitating him to call between the hours of 11:00 p.m. PST and 1:45 p.m. PST, times when E.M. was either sleeping or in daycare.   At one point Mr. Muhlenkamp expressed an interest in visiting E.M. for Christmas in Spokane, and Mr. Muhlenkamp's mother told Ms. Blizzard she would provide some money for Mr. Muhlenkamp to make the trip.   The money being insufficient, Mr. Muhlenkamp did not come to Spokane.

At the September 12, 2007, hearing, testimony by E.M.'s current daycare provider and by Ms. Blizzard indicated the following facts. E.M. is performing at two to three age levels above her own.   E.M. is well-liked by her peers at the daycare and has a strong core of friends. Ms. Blizzard routinely takes E.M. to community cultural events.   E.M. has many relatives in the Northwest and in Arizona, whose homes Ms. Blizzard and E.M. often spend holidays.   Based on these facts, the Court finds

ORDER ~ 7

E.M. has settled in Spokane, Washington, as defined by the Hague Convention, for reasons stated below.

### III.  Applicable Law and Analysis

The primary purpose of the Hague Convention is "[1] to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and [2] to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." *Id.* art. 3.  "It is thus legitimate to assert that the two objects of the Convention - the one preventative, the other designed to secure the immediate reintegration of the child into its habitual environment - both correspond to a specific idea of what constitutes the 'best interests of the child.'" Elisa Perez-Vera, Explanatory Report, ¶ 25, *in* HAGUE CONFERENCE PRIVATE INTERNATIONAL LAW, ACTS AND DOCUMENTS OF THE FOURTEENTH SESSION, CHILD ABDUCTION 426 (1982).[1]  Thus, the interest at the heart of the act is not that of the parents, but of the child.  Accordingly, a judicial proceeding to determine the appropriate

---

[1] Elisa Perez-Vera was the official Hague Conference reporter. *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).  The Hague Convention recognize the Perez-Vera report "'as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.'"  Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10503 (1986); *see also Mozes*, 239 F.3d at 1070; *Shalit v. Coppe*, 182 F.3d 1124, 1127-28 (9th Cir. 1999).

ORDER ~ 8

residency of a child between two nations should be fair and efficient enough to not cause undue strain on the child. The Hague Convention has been implemented by Congress through the International Child Remedies Act (ICARA), 42 U.S.C. §§ 11601-11611. The Hague Convention is not meant for deciding the "merits of the underlying custody dispute but whether the child should be returned to a country for custody proceedings under that country's domestic law." *Papakosmas v. Papakosmas*, 483 F.3d 617, 621 (9th Cir. 2007) (citing *Holder v. Holder* (*Holder II*), 392 F.3d 1009, 1013 (9th Cir. 2004)).

**A. Jurisdiction**

The Court must first determine whether it has jurisdiction to hear the case. Hague Convention provides, "[t]he judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children." Hague Conv. art. 11. The language of the preceding articles indicate that "judicial or administrative authorities of Contracting States" refers to the courts of the country where the child currently resides, not in the country where the child may have been "wrongfully removed or retained [therefrom]." *Id.* art. 9-10. Hague Convention covers children under the age of 16. *Id.* art. 4.

E.M. was removed from Germany to the United States. E.M. is now 3 years old, within the Hague Convention's age range. Thus, this Court is the "judicial or administrative authority" referred to in Article 11 and is an appropriate body to render a decision regarding whether E.M. was wrongfully removed or retained from Germany.

//

//

ORDER ~ 9

**B.  Petitioner's Request for Relief**

In determining the appropriate location of a child under the Hague Convention, the threshold issue is whether the removal or retention of the child was wrongful.  *Holder II*, 392 F.3d at 1014.  The Bayreuth Local Court may have superseded this Court in its determination that Ms. Blizzard wrongfully removed E.M.  (Ct. Rec. 1, Ex. P: *In Sachen: Muhlenkamp v. Blizzard* (Mar. 27, 2007).)  Thus, this Court is confronted with the question of whether the Court must respect the Bayreuth Local Court's decision and enter an order compelling the return of E.M.

**1.  Full Faith and Credit: Bayreuth Local Court**

United States courts are to give full faith and credit "to the judgment of any other . . . court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter."  42 U.S.C. § 11603(g).  The Bayreuth Local Court entered an order and "Certificate of Wrongfulness" declaring the removal of E.M. was "wrongful" within the meaning of the Hague Convention.  (Ct. Rec. 1, Ex. P.)  Article 15 of the Hague Convention allows:

> The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State.  The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination.

Hague Conv. art. 15.  Here, the question of the wrongfulness of E.M.'s detention has already been decided by the Bayreuth Local Court.  (Ct.

Rec. 1, Ex. P.)  Although the typical procedure under Article 15 would
be for this Court to request a determination of wrongfulness by a German
court, because the Bayreuth Local Court has already made a determination,
this Court must determine whether to give the decision full faith and
credit under ICARA, 42 U.S.C. § 11603(g).

Several concerns arise from the Bayreuth Local Court's decision.
First, Ms. Blizzard never received notice of this proceeding (Ct. Rec.
5: Blizzard Resp. ¶ 14), nor did the Bayreuth Local Court or
Mr. Muhlenkamp ever attempted to notify Ms. Blizzard of the custody
proceeding and Hague Convention issue.  Second, the Bayreuth Local
Court's requisite level of burden of proof is below the standard mandated
by ICARA and the Hague Convention.  That court simply stated that
Mr. Muhlenkamp had "shown *plausibly* by submission of an affidavit dated
October 18, 2006, and the notarized revocation of travel permission dated
August 14, 2006 [sic] that he has joint right of custody of [E.M.]," and
therefore the court made a finding of "wrongfulness" pursuant to the
Hague Convention.  (Ct. Rec. 1, Ex. P (emphasis added.))  However, the
requisite burden of proof is more than "plausible"; a petitioner must
"establish by a preponderance of the evidence" the child was wrongfully
removed.  42 U.S.C. § 11603(e)(1)(a).

Because no notice was made to Ms. Blizzard of the proceeding and the
Bayreuth Local Court applied a burden of proof substantially less then
the requisite burden, this Court does not give full faith and credit to
the Bayreuth Local Court decision.

//

//

ORDER ~ 11

### 2. Wrongful Removal or Retention

The petitioner bears the burden of proving the removal or retention was wrongful by a preponderance of the evidence. ICARA, 42 U.S.C. § 11603(e). The Hague Convention provides that the removal or retention of a child is "wrongful" when:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the Child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Conv. art. 3; *see also Papakosmas*, 483 F.3d at 622. The Ninth Circuit requires four questions to be answered in applying this Hague Convention provision:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Papakosmas*, 483 F.3d at 622 (citing *Mozes*, 239 F.3d at 1070); *see also Von Kennel Gaudin v. Remis*, 282 F.3d 1178, 1182 (9th Cir. 2002).

### a. Time of Removal and Retention

Removal of E.M. from Germany occurred on June 12, 2006. (Ct. Rec. 5: Blizzard Resp. ¶ 12.) Retention, if wrongful, occurred after the two-week window Mr. Muhlenkamp believed Ms. Blizzard would be in the United States. Thus, retention occurred on June 26, 2006.

### b.  Location of Habitual Residence

The Hague Convention provides no definition of "habitual residence." *Mozes*, 239 F.3d at 1070.  The Perez-Vera Report stated that the Convention regarded the question of "habitual residence" as one of pure fact.  Perez-Vera Report ¶ 66.  However, the Ninth Circuit stated that the initial factual focus of the inquiry "ultimately . . . rests on a legal determination." *Holder II*, 392 F.3d at 1015; *Mozes*, 239 F.3d at 1073.  The Ninth Circuit set an analytical framework to determine a child's habitual residence:

> First, in order to acquire a new habitual residence, there must be a "settled intention to abandon the one left behind." . . . Second, there must be (A) an "actual 'change in geography,'" combined with (B) the "passage of 'an appreciable period of time.'"

*Holder II*, 392 F.3d at 1015 (citations omitted; quoting *Mozes* 239 F.3d at 1075-78).  This test is unnecessary here.  Although E.M. possessed a U.S. social security card, U.S. birth certificate, and U.S. passport (Ct. Rec. 5, Ex. 1-3), prior to the removal, E.M. was born and lived in Germany her entire life (Ct. Rec. 5: Blizzard Resp. ¶ 4).  Therefore, at the time of removal, the Court concludes E.M.'s habitual residence was in Germany, though it is certain that the parties agreed that Ms. Blizzard was relocating to the United States with E.M. to begin her job in Spokane, Washington.

### c.  Rights of Custody

Under the Hague Convention, rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Conv. art. 5. German law gives both parents equal custody of a child.  Burgerliches

ORDER ~ 13

Gesetzbuch [BGB][Civil Code] Aug. 18, 1896, §§ 1621 ¶ 1, 1627; *see Shealy v. Shealy*, 295 F.3d 1117, 1124 (10th Cir. 2002); *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996); *see also Kufner v. Kufner*, 480 F. Supp. 2d 491, 508 (D.R.I. 2007).  "The violation of a *single* custody right suffices to make removal of a child wrongful." *Furnes v. Reeves*, 362 F.3d 702, 714-15 (11th Cir. 2004) (citing Hague Conv. art. 3).  "Just as there is no requirement in the Convention that a custody right be exercised exclusively by the parent seeking return, there is no requirement that the right be exercised predominantly by that parent." *Id.* at 716.

While the potential number of custody rights are much broader under the Hague Convention than a particular jurisdiction's law, the Second Circuit has held "rights of access do not constitute rights of custody within the meaning of the Hague Convention . . . ." *Croll v. Croll*, 229 F.3d 133, 135 (2d Cir. 2000).  Rights of access "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Conv. art. 5(b).

This case presents us with the question of whether Mr. Muhlenkamp retained merely a right of access, rather than rights of custody, when he agreed to let Ms. Blizzard take E.M. to the United States.  On May 5, 2006, Mr. Muhlenkamp signed a general letter written by Ms. Blizzard giving his "express permission for Allison Blizzard to travel internationally and remain abroad indefinitely with [E.M.]." (Ct. Rec. 1, Ex. K.)  Mr. Muhlenkamp and Ms. Blizzard disagree as to what "indefinitely" meant.  Ms. Blizzard argued "indefinitely" meant a complete and total release of custodial rights.  Mr. Muhlenkamp argued

"indefinitely" was used because no date was established as to when Ms. Blizzard would leave for the United States in order to visit her sick mother.    Mr. Muhlenkamp also argued the rather open-ended word "internationally" was used because flight paths to the United States might go through any number of nations.    Thus, according to Mr. Muhlenkamp, he gave permission only for Ms. Blizzard to travel and remain in the United States with E.M. in order to visit her sick mother, not to remain with E.M. forever in the United States.  Almost immediately upon E.M.'s arrival in Arizona, emails from Mr. Muhlenkamp to Ms. Blizzard indicate Mr. Muhlenkamp believed Ms. Blizzard would be returning to Germany within a couple of weeks in order to make a final custody rights determination.  (Ct. Rec. 19, Ex. 9, 11, 12, 14.)  When Mr. Muhlenkamp became concerned that Ms. Blizzard would not return, he threatened legal action. *Id.*  From these facts, Mr. Muhlenkamp retained the right to determine custody rights, including parental-decision making roles and the right of visitation, in Germany.  Choice of law can have a substantial impact on what custody rights are ultimately conferred to either parent.  Additionally, the right to have a custody proceeding within one's own country substantially lessens the economic burden on that parent.   These rights are substantially more than a "right of access," which is not a custodial right. *Croll*, 229 F.3d at 135.  For this reason, the Court concludes Mr. Muhlenkamp possessed rights of custody at the time of removal.

### d.  Exercise of Custodial Rights

Mr. Muhlenkamp demonstrated his right to a custodial proceeding at the first instance when he believed Ms. Blizzard was acting in violation

of the right.  Mr. Muhlenkamp did not know of Ms. Blizzard's intention on June 12, 2006, the time of removal, and therefore did not exercise his custodial right at the time of removal.  However, when Mr. Muhlenkamp became aware of Ms. Blizzard's intent, he exercised his rights and did not acquiesce to the retention of E.M. in the United States.  Therefore, this Court concludes wrongful retention occurred on June 26, 2006.

**3.  Exceptions**

Articles 12 and 13 of the Hague Convention provide three exceptions to a mandated return after a court makes a determination of wrongful removal or retention: grave risk of harm to the child, petitioner's consent to removal or acquiescence to retention, and a one-year limitation for bringing suit.

**a.  Grave Risk of Harm**

A court may deny return of a child to its habitual residence if the court finds doing so would present a grave risk of harm to the child. Hague Conv. art. 13(b).  Respondent waived this exception at trial. Thus, this Court need not address the grave risk exception.

**b.  Consent or Acquiescence**

The second exception provides, "[The court] is not bound to order the return of the child if the [petitioner] consented to or subsequently acquiesced in the removal or retention."  Hague Conv. art. 13(a).  Under the above analysis for wrongful removal and retention, this Court determined Mr. Muhlenkamp agreed to permit Ms. Blizzard to travel and remain with E.M. in the United States in order to visit Ms. Blizzard's sick mother in Arizona.  After Ms. Blizzard remained in the United States beyond two weeks and retained E.M., Ms. Blizzard exceeded

Mr. Muhlenkamp's consent. Mr. Muhlenkamp's emails shortly following the removal clearly indicate he never acquiesced to the retention. (Ct. Rec. 19, Ex. 9, 11, 12, 14, 17.) Thus, this Court concludes that the consent exception does not apply.

### c. One-Year Limitation

If the petition was filed one year from the time of the alleged wrongful removal or retention and the child has since "settled into [her] new environment," then the court must not order the return of the child.[2] Hague Conv. art. 12. This Court must answer when the one-year limitation began to run, whether the limitation was equitably tolled, when the filing occurred, and, if necessary, whether E.M. has settled.

### i. When did the one-year limit begin to run?

The one-year limit runs when the petitioner should have known of the wrongful removal or retention. *See Furnes v. Reeves*, 362 F.3d 702, 723 (11th Cir. 1998) (upholding application of the doctrine of equitable

---

[2] The Hague Convention states:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Conv., art 12 (emphasis added).

tolling under the Hague Convention).  Here, the first instance indicating Petitioner's knowledge of wrongful retention might occur is the email sent by Mr. Muhlenkamp on June 22, 2006, indicating he believed a stay in the United States beyond two weeks was "not legal."  (Ct. Rec. 19, Ex. 11.)  Ms. Blizzard and E.M. left Germany on June 12, 2006.  Thus, the Court concludes the wrongful retention began when the two weeks ran on June 26, 2006.

### ii.  Was the one-year limit tolled?

The one-year limit can be equitably tolled if the respondent hides the child's location from the petitioner.  *Furnes*, 362 F.3d at 723. Here, although Ms. Blizzard did not provide her address to Mr. Muhlenkamp upon request, failure to provide information in this instance falls far short of secreting away of the child.  Ms. Blizzard called Mr. Muhlenkamp immediately upon arrival in Arizona.   Mr. Muhlenkamp possessed the address of Ms. Blizzard's sister in Arizona.  (Ct. Rec. 19, Ex. 35: Revocation Letter sent to Ms. Blizzard care of Billie Zundel.) Mr. Muhlenkamp was aware of Ms. Blizzard's move to Spokane. Mr. Muhlenkamp was able to obtain both Ms. Blizzard's personal post office address and work address at Spokane Falls.  Ms. Blizzard testified that Mr. Muhlenkamp sent a package to Ms. Blizzard's home address. Mr. Muhlenkamp possessed regular telephonic and email communication with Ms. Blizzard and E.M.   These facts fall far short of hiding the child. The Court concludes equitable tolling is not warranted.

### iii.  When was the filing made?

The petition must be filed with the court of record, not the Central Authority, to file within the one-year limitation.  *Wojcik v.Wojcik*, 959

1    F. Supp. 413, 420 (E.D. Mich. 1997); *see also In re D.D.*, 440 F. Supp. 2d

2    1283, 1298 (M.D. Fla. 2006); *Belay v. Getachew*, 272 F. Supp. 2d 553, 561

3    (D. Md. 2003). Here, Mr. Muhlenkamp filed his petition to this Court on

4    July 17, 2007. Wrongful retention began on June 26, 2006. The Court

5    concludes the filing occurred outside the one-year limitation.

6                        **iv.  Was E.M. settled?**

7         The burden of demonstrating settlement rests with the respondent.

8    Hague Conv. art. 12. This Court has broad discretion in finding whether

9    settlement has occurred. The Ninth Circuit has stated:

10               The question whether a child is in some sense
                 "settled" in its new environment is so vague as to
11               allow findings of habitual residence based on
                 virtually any indication that the child has generally
12               adjusted to life there. Further, attempting to make
                 the standard more rigorous might actually make matters
13               worse, as it could open children to harmful
                 manipulation when one parent seeks to foster
14               residential attachments during what was intended to be
                 a temporary visit - such as having the child profess
15               allegiance to the new sovereign.

16   *Mozes*, 239 F.3d at 1079. The Ninth Circuit provides a dim light as to

17   what factors are pertinent: "[S]ome courts regard the question whether

18   a child is doing well in school, has friends, and so on, as more

19   straightforward and objective . . . ." *Id.*

20        Here, E.M. is performing at two to three age levels above her own.

21   E.M. also is well-liked and has a strong core of friends. Ms. Blizzard

22   routinely takes E.M. to community cultural events. E.M. has many

23   relatives in the Northwest and in Arizona, where they often spend

24   holidays. Thus, this Court finds E.M. has settled. Because E.M. has

25   settled, the one-year limitation exception applies. Therefore, even

26   though the Court finds Ms. Blizzard wrongfully retained E.M. outside of

Germany, the Court concludes E.M. shall remain with Ms. Blizzard in the United States.

### IV.  Conclusions of Law

Based on the foregoing analysis, the Court makes the following conclusions of law.  The Bayreuth Local Court's decision is not afforded full faith and credit.  Mr. Muhlenkamp retained custody rights. Ms. Blizzard wrongfully retained E.M. in the United States from Germany. Mr. Muhlenkamp filed his petition past the one-year limitation imposed by the Hague Convention.  Because the Court finds E.M. settled in Spokane, Washington, the Court concludes E.M. shall not be returned to Germany.

### V.  Custody Proceeding

As already mentioned, this Court lacks jurisdiction to hear a custody proceeding.  Additionally, while the ICARA allows a court to impose provisional remedies "to protect the well-being of the child involved or to prevent the child's further removal or concealment," IRACA only establishes the authority *prior to* "final disposition of the petition."  42 U.S.C. § 11604.  The district court cases that have found in favor of the respondent clearly demonstrate that a temporary order on custody should not be issued.  *Abbott v. Abbott*, 495 F. Supp. 2d 635 (W.D. Tex. 2007); *Stevens v. Stevens*, 499 F. Supp. 2d 891 (E.D. Mich. 2007); *Baran v. Beaty*, 479 F. Supp. 2d 1257 (S.D. Ala. 2007); *Van Drissche v. Ohio-Esezeoboh*, 466 F.Supp. 2d 828 (S.D. Tex. 2006); *In re Kim*, 404 F. Supp. 2d 495 (S.D. N.Y. 2005); *Silvestri v. Oliva*, 403 F. Supp. 2d 378 (D. N.J. 2005).  Thus, this Court does not enter a temporary order on custody.  Custody shall be determined either in the

ongoing divorce proceeding between Mr. Muhlenkamp and Ms. Blizzard in Arizona or in a separate child custody proceeding to be commenced.

Accordingly, **IT IS HEREBY ORDERED:**

1.    Petitioner's remaining Requests for Relief **(Ct. Rec. 9 ¶ 22)** are **DENIED.**

2.    Respondent may obtain her and E.M.'s passports from the Clerk's Office.

3.    The parties' Stipulated Motion to Extend the Temporary Restraining Order **(Ct. Rec. 23)** is **DENIED AS MOOT.**

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and to provide copies to all counsel.

**DATED** this <u>23rd</u> day of October 2007.


                        S/Edward F. Shea
                    _____
                         EDWARD F. SHEA
                    United States District Judge
Q:\Civil\2007\0231.order.wpd

ORDER ~ 21